**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**STACEY L. MAGRUDER,**

               Plaintiff,

**v.**

         **CIVIL ACTION NO.: 2:16-CV-15**
         **(BAILEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

               Defendant.

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On March 9, 2016, Plaintiff Stacey L. Magruder ("Plaintiff"), through counsel Christopher M. Turak, Esq.,[1] filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On May 23, 2016, the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 4; Admin. R., ECF No. 5). On June 22, 2016, Plaintiff filed a Statement of Errors and supporting brief. (Pl.'s Statement of Errors ("Pl.'s Br."), ECF No. 8). In turn, the Commissioner filed her Motion for Summary Judgment and supporting brief on August 22, 2016. (Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 14; Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Br."), ECF No. 15). The matter is now

---

[1] Shannon R. Bateson, whose *pro hac vice* application was granted on July 21, 2016, is also representing Plaintiff. Order, ECF No. 13.

before the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II.  PROCEDURAL HISTORY

On June 18, 2012, Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB"), alleging disability that began on January 31, 2012. (R. 15, 165). Because Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through June 30, 2014, Plaintiff must establish disability on or before this date. (R. 15). Plaintiff's claim was initially denied on December 20, 2012, and denied again upon reconsideration on May 6, 2013. (R. 96, 110). After these denials, Plaintiff filed a written request for a hearing. (R. 119).

On October 23, 2014, a video hearing was held before United States Administrative Law Judge ("ALJ") Jeffrey P. La Vicka in Morgantown, West Virginia. (R. 15, 35, 130). Larry Ostrowski, Ph.D., an impartial vocational expert, appeared and testified in Morgantown. (R. 15, 35). Plaintiff, represented by Shannon R. Bateson, Esq., appeared and testified in Wheeling, West Virginia. (Id.). On November 3, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 12). On January 21, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

## III.   **BACKGROUND**

**A.   Personal History**

Plaintiff was born on February 12, 1978, and was thirty-four years old at the time she filed her DIB claim. (See R. 71). She is 5'5" tall and weighs approximately 240 pounds. (R. 198). She is married and lives in a house with her husband. (R. 207). She has completed "[four] or more years of college" but has not otherwise received any specialized, trade or vocational training. (R. 199). Her prior work experience includes working as a companion, jewelry salesperson, accounting clerk and community worker. (R. 63-64). She alleges that she is unable to work due to the follow ailments: (1) epilepsy; (2) severe anxiety; (3) high cholesterol; (4) a right foot impairment; (5) a heart murmur; (6) acid reflux; (7) enlarged lymph nodes in her neck; (8) allergies; (9) migraines and (10) "possible fibromyalgia." (R. 198, 243).

**B.   Medical History**

**1.   Medical History Pre-Dating Alleged Onset Date of January 31, 2012**

Plaintiff receives primary care from Charles J. Bradac, D.O., of the Belmont Community Hospital. (R. 314). Dr. Bradac has treated Plaintiff since she was eighteen years old and has diagnosed and treated her for seizures, depression, a folic acid deficiency, gastroesophageal reflux disease ("GERD") and migraine headaches. (R. 58, 295). Dr. Bradac prescribes phenobarbital for Plaintiff's seizures, Celexa for her depression, folic acid for her folic acid deficiency and Prilosec for her GERD. (See R. 295, 297).

In September of 2007, Plaintiff presented to the Belmont Community Center to undergo various testing to monitor her seizure disorder. (R. 307, 314). On September

10, 2007, Dr. Bradac ordered a CAT scan of Plaintiff's head, noting that Plaintiff suffered from headaches, had a history of seizures and had remotely fractured her skull while in high school. (R. 314). The results of the CAT scan were unremarkable. (Id.). On September 10, 2007, Gurmeet Singh, M.D., Plaintiff's neurologist, ordered that Plaintiff undergo an electroencephalogram ("EEG"), the results of which were normal. (R. 307).

On May 18, 2010, Plaintiff presented to the office of Jeremy Tiu, M.D., an otolaryngologist, after being referred by Dr. Bradac. (R. 266-67). During this visit, Plaintiff stated that she had been experiencing prolonged lymph node enlargement in her neck. (R. 266). Plaintiff further stated that the lymph node enlargement had occurred after an episode of tonsillitis. (Id.). After an examination, Dr. Tiu diagnosed Plaintiff with chronic cryptic tonsillitis and lymphadenopathy. (Id.). Dr. Tiu noted that he suspected the lymphadenopathy was caused by Plaintiff's chronic tonsillitis. (Id.). Subsequently, during a follow-up appointment, Dr. Tiu documented that Plaintiff's lymphadenopathy was stable. (R. 268). However, he also documented that Plaintiff had developed more enlarged lymph nodes after an episode of an upper respiratory infection. (Id.). Dr. Tiu instructed Plaintiff to monitor the new enlarged lymph nodes for one month and, if she did observe any improvement, to request an antibiotic. (Id.).

On July 2, 2010, Plaintiff presented to the Belmont Community Hospital, complaining of chest pain. (R. 308). Dr. Bradac ordered that Plaintiff undergo an echocardiogram, which revealed, *inter alia*, anterior ischemia and a left ventricular ejection fraction of forty-nine percent. (R. 316). Dr. Bradac also ordered that Plaintiff undergo a stress test, which was positive. (R. 309). Therefore, Plaintiff was referred for cardiac catheterization, which was performed on July 9, 2010. (Id.). After the

catheterization, Plaintiff was encouraged to aggressively manage her risk factors by engaging in exercise and weight control. (R. 311).

### 2. Medical History Post-Dating Alleged Onset Date of January 31, 2012

On February 23, 2012, Plaintiff presented to the emergency department at Reynolds Memorial Hospital, complaining of back pain. (R. 290). An X-ray of Plaintiff's lumbosacral spine was ordered, which revealed no abnormalities. (Id.). Therefore, Plaintiff was diagnosed with lumbar strain and prescribed Naprosyn, Flexeril and Vicodin for her pain. (R. 291).

On May 18, 2012, Plaintiff presented to the emergency department at Wetzel County Hospital, stating that she had fallen down one step at home and had injured her right ankle. (R. 272-73). X-rays of Plaintiff's right ankle were ordered, which revealed no evidence of fracture or dislocation. (R. 275). As a result, Plaintiff was diagnosed with a right ankle sprain and prescribed Ultram for her pain. (R. 274, 283). Plaintiff was also provided with ace wrap and crutches. (R. 274).

Three days later, on May 21, 2012, Plaintiff returned to the emergency department at Wetzel County Hospital, complaining of continuing right ankle pain and swelling. (R. 286). More X-rays were taken, which were all negative. (R. 287-89). Therefore, Plaintiff's diagnosis of a right ankle sprain was affirmed and a splint was applied to her right ankle. (R. 287). Plaintiff was instructed to apply ice to and elevate her right ankle. (Id.). Plaintiff was also prescribed Naprosyn and Lortab for her pain. (Id.).

On July 5, 2012, Plaintiff presented to the Belmont Community Hospital for a follow-up appointment regarding her right ankle. (R. 299). Dr. Bradac noted that Plaintiff

had a cast on her right ankle and foot that was scheduled to be removed on July 23, 2012. (R. 299, 422). In addition to right ankle complaints, Plaintiff stated that she was experiencing worsening anxiety. (R. 299). She also stated that she "can not [sic] hold a job" and that she "would like disability papers filed." (Id.). Finally, Plaintiff informed him that she "need[ed] [a] paper stating she is unable to work for student loan [purposes]." (Id.).

On September 28, 2012, Plaintiff returned to the Belmont Community Hospital for a follow-up appointment. (R. 300). Dr. Bradac noted that Plaintiff had recently visited an emergency department with complaints of sciatica. (Id.). After an examination, Dr. Bradac diagnosed Plaintiff with left sciatica and administered a Toradol injection for her pain. (Id.). Dr. Bradac also prescribed Percocet, continued her Flexeril prescription and recommended physical therapy for her pain. (Id.).

On June 4, 2013, Plaintiff presented to the Belmont Community Center, stating that "she hurts all over." (R. 426). After an examination, Dr. Bradac opined that Plaintiff may suffer from fibromyalgia. (Id.). Therefore, Dr. Bradac increased Plaintiff's Celexa dosage, continued her Flexeril prescription and prescribed Vicodin and Mobic for her complaints of pain. (Id.).

On November 5, 2013, Plaintiff returned to the Belmont Community Center, complaining of fatigue and of her "left leg going numb." (R. 428). After an examination, Dr. Bradac diagnosed Plaintiff with left leg numbness. (Id.). Dr. Bradac instructed Plaintiff to consult with Dr. Singh, her neurologist, regarding her symptoms. (Id.).

On January 21, 2014, Plaintiff again returned to the Belmont Community Center, complaining of left sciatica. (R. 429). Plaintiff stated that "[n]othing seems to help with

the pain." (Id.). After an examination, Dr. Bradac administered Depo Medrol and Toradol injections to treat Plaintiff's pain. (Id.). Dr. Bradac also started Plaintiff on a trial of Celebrex. (Id.).

On March 3, 2014, Plaintiff presented to the emergency department at Wetzel County Hospital, stating that she had slipped on ice while walking in the street and was now experiencing pain in her lower back, both knees and right wrist, arm and shoulder. (R. 411, 416). X-rays of Plaintiff's lumbar spine, knees and right upper and lower arm were taken, which revealed no acute abnormalities. (R. 412-15). Therefore, Plaintiff was diagnosed with a lumbosacral strain, bilateral knee contusions and right shoulder sprain. (R. 417). Plaintiff was prescribed Ultram and Flexeril for her pain. (R. 418).

On April 8, 2014, Plaintiff presented to the Belmont Community Hospital for a follow-up visit regarding the injuries from her fall. (R. 430). After an examination, Dr. Bradac diagnosed Plaintiff right knee pain and right shoulder pain secondary to her fall. (R. 431). Dr. Bradac referred Plaintiff to physical therapy for her right knee and ordered an MRI of her right shoulder. (Id.).

### 3. Medical Reports/Opinions

#### a. Attending Physician's Statement by Charles Bradac, D.O., September 28, 2012[2]

On September 28, 2012, Dr. Bradac, Plaintiff's primary care physician, completed an Attending Physician's Statement on Plaintiff's behalf. (R. 384-85). In this statement, Dr. Bradac declares that he has diagnosed Plaintiff with, *inter alia*, seizures, depression and GERD. (R. 384). Dr. Bradac further declared that, to treat these

---

[2] This statement was addressed to Sallie Mae, Inc., Plaintiff's student loan provider. (R. 384-85).

impairments, he prescribed Plaintiff the following medications: phenobarbital, Celexa, Prilosec, folic acid, Vicodin, Flexeril, Naproxen, Claritin, Nasonex and aspirin. (Id.).

Also in the statement, Dr. Bradac opines that Plaintiff suffers from functional limitations. (R. 385). For example, Dr. Bradac opines that Plaintiff suffers from moderate physical limitations limiting her to sedentary work. (Id.). Additionally, Dr. Bradac opines that Plaintiff suffers from marked mental/nervous limitations and that she "is unable to engage in stress situations or engage in interpersonal relations." (Id.). Finally, Dr. Bradac opined that, due to her combined limitations, Plaintiff is "totally disabled" and "unable to work" and that her circumstances are unlikely to improve. (Id.).

### b. Disability Determination Examination by Thomas J. Schmitt, M.D., November 12, 2012

On November 12, 2012, Thomas J. Schmitt, M.D., performed a Disability Determination Examination of Plaintiff. (R. 398-03). This examination consisted of a clinical interview and a physical examination of Plaintiff. (See id.). Prior to the examination, Dr. Schmitt documented that he would focus on evaluating Plaintiff's cardiac status, seizure disorder and orthopedic status. (R. 398).

During the clinical interview, Plaintiff stated that she suffers from "substernal chest pain attributed by her [primary care] physician to her anxiety." (Id.). Plaintiff further stated that she suffers from a seizure disorder, that she has experienced seizures since her childhood and that she visits a neurologist annually for treatment of the disorder. (Id.). Finally, Plaintiff stated that she suffers from lumbar pain, pain in both of her knees and arthralgias of the ankles. (Id.).

After the clinical interview, Dr. Schmitt performed a physical examination of Plaintiff. (R. 399-01). When summarizing his findings from the examination, Dr. Schmitt

documented that Plaintiff's cardiac evaluation was negative/normal and that her neurological evaluation was normal. (R. 401). However, Dr. Schmitt also documented that Plaintiff's orthopedic evaluation revealed that her range of motion "is limited to 60 degrees forward flexion." (Id.). Ultimately, Dr. Schmitt concluded that Plaintiff suffers from multiple arthralgias, chronic low back syndrome and mild decreased range of motion of her lumbar spine. (Id.).

### c. Mental Status Examination by M. Aileen Mansuetto, M.A., November 26, 2012

On November 26, 2012, M. Aileen Mansuetto, M.A., a licensed psychologist, performed a Mental Status Examination of Plaintiff. (R. 392-96). Prior to the Mental Status Examination, Dr. Mansuetto noted that Plaintiff "drove herself" to Dr. Mansuetto's office, which required her to "drive[ ] a distance of at least 45 miles in one direction." (R. 392).

The Mental Status Examination consisted of a clinical interview and a mental assessment of Plaintiff. (Id.). During the clinical interview, Dr. Mansuetto inquired about Plaintiff's mental health. (See R. 392-94). Plaintiff informed Dr. Mansuetto that she has always disliked leaving her home but that, in the past five years, she has developed an extreme fear of leaving her home. (R. 393). Plaintiff explained that she is afraid of experiencing an epileptic seizure or panic attack in public. (Id.). Plaintiff also informed Dr. Mansuetto that her energy level is poor and that she experiences crying episodes at times, particularly when she is feeling anxious. (Id.). Finally, Plaintiff informed Dr. Mansuetto that she has never received treatment from a mental health facility. (R. 394). After the clinical interview, Dr. Mansuetto noted that Plaintiff had appeared extremely anxious and emotional throughout the interview. (R. 392).

After interviewing Plaintiff, Dr. Mansuetto performed a thorough mental assessment of Plaintiff. (R. 394-95). While Dr. Mansuetto's findings were largely normal, Dr. Mansuetto documented several abnormal findings. (R. 395). For example, Dr. Mansuetto noted that Plaintiff "has an almost delusional thought process going on thinking that her family is the Walton family from television" and that she "has obsessive thoughts inasmuch that she thinks that if she calls everybody in her family each night before they go to bed that they will be safe." (Id.). Dr. Mansuetto further noted that Plaintiff exhibits agitated psychomotor activity when anxious and that her recent memory is markedly deficient. (Id.).

After completing the Mental Status Examination, Dr. Mansuetto concluded that Plaintiff suffers from generalized anxiety disorder and panic disorder with agoraphobia. (Id.). Dr. Mansuetto further concluded that Plaintiff's prognosis would improve if she could receive access to mental health services. (Id.).

### d. Disability Determination Explanation by Chester Frethiem, Psy.D., December 19, 2012

On December 19, 2012, Chester Frethiem, Psy.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 71-82). Prior to drafting the Initial Explanation, Dr. Frethiem reviewed, *inter alia*, Plaintiff's medical records, treatment notes and Adult Function Report. (R. 72-74). After reviewing these documents, Dr. Frethiem concluded that Plaintiff suffers severe epilepsy and severe osteoarthritis and allied disorders. (R. 76). Dr. Frethiem further concluded that Plaintiff's suffers from non-severe anxiety disorders. (Id.).

In the Initial Explanation, Dr. Frethiem completed a Psychiatric Review Technique form. (R. 76-77). On this form, Dr. Frethiem analyzed the degree of Plaintiff's functional limitations. (R. 76). Specifically, Dr. Frethiem rated Plaintiff's restriction of her activities of daily living, difficulties in maintaining concentration, persistence or pace and difficulties in maintaining social functioning as "mild." (Id.). Finally, Dr. Frethiem rated Plaintiff's episodes of decompensation as "none."[3] (Id.).

Also in the Initial Explanation, Jeremy D. Louk, SDM, completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 78-79). During this assessment, Dr. Louk found that, while Plaintiff possesses no manipulative, visual, communicative or limitations, Plaintiff possesses exertional, postural and environmental limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Louk found that Plaintiff is able to: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 78). Regarding Plaintiff's postural limitations, Dr. Louk determined that Plaintiff is able to frequently stoop, kneel, crouch and crawl but is only able to occasionally climb ramps/stairs, balance and climb ladders/ropes/scaffolds. (R. 78-79).

Finally, regarding Plaintiff's environmental limitations, Dr. Louk found that Plaintiff must avoid concentrated exposure to extreme heat and extreme cold but need not avoid exposure to wetness, humidity, noise, vibrations, or "[f]umes, odors, dusts, gases, poor ventilation, etc." (R. 79). Dr. Louk further found that Plaintiff must avoid even moderate exposure to hazards such as machinery and heights. (Id.). After completing the RFC

---

[3] These findings depict the four "paragraph B" criteria that the Code of Federal Regulations sets forth for evaluating the severity of claimants' mental impairments. See 20 C.F.R. § 416.920a.

assessment, Dr. Louk concluded that Plaintiff is able to perform medium-level exertional work. (R. 79, 81).

### e. Disability Determination Explanation by Narendra Parikshak, M.D., May 3, 2013

On May 3, 2013, Narendra Parikshak, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 84-95). Prior to drafting the Reconsideration Explanation, Dr. Parikshak reviewed the same documents that Dr. Frethiem had reviewed when drafting the Initial Explanation, in addition to Plaintiff's updated medical records. (R. 85-88). After reviewing these documents, Dr. Parikshak largely agreed with Drs. Frethiem's and Louk's opinions but dissented from several of Dr. Louk's findings from the physical RFC assessment. (R. 91-92). Specifically, regarding Plaintiff's exertional limitations, Dr. Parikshak determined that Plaintiff is able to occasionally lift and/or carry twenty, not fifty, pounds. (R. 91). Regarding Plaintiff's postural limitations, Dr. Parikshak determined that Plaintiff should never, instead of occasionally, be permitted to climb ladders/ropes/scaffolds. (Id.). Regarding Plaintiff's environmental limitations, Dr. Parikshak determined that Plaintiff should avoid all exposure, not just moderate exposure, to hazards such as machinery and heights and should avoid concentrated exposure to wetness and humidity. (R. 92).

Also in the Reconsideration Explanation, Paula J. Bickham, Ph.D., a state agency psychological consultant, reviewed Dr. Frethiem's Psychiatric Review Technique form from the Initial Explanation and "affirmed [it] as written." (R. 89).

### C.     Testimonial Evidence

During the administrative hearing on October 23, 2014, Plaintiff divulged her relevant personal facts and work history. Plaintiff is married and lives with her husband and seventy-year-old father-in-law. (R. 39). She does not have any children. (Id.). She completed four or more years of college and, in 2006, obtained a Bachelor's degree in business.[4] (R. 43-44). Her job history includes working in an accounting office and as a social worker, jewelry supervisor and direct care worker. (R. 47-50). Most recently, she worked as a service coordinator for Russell Nesbitt Services, Inc., where her job duties included visiting clients at their homes and supplying them with necessities. (R. 45-46). Plaintiff stopped working at Russell Nesbitt Services when the "anxiety got to [her] and she "wasn't able to control it anymore." (R. 46).

Plaintiff testified that she is unable to work because of her epilepsy, anxiety and back pain. (R. 51, 59). Regarding her epilepsy, Plaintiff experiences sleep "attacks" and staring spells. (R. 52). Her staring spells last "maybe like a minute or two or a couple seconds" and occur three to five times a day. (R. 56). The spells cause her to develop a headache and to feel drowsy. (Id.). When the spells occur, Plaintiff "take[s] some . . . of [her] medicine" and "ha[s] to go to sleep." (Id.). She is prescribed phenobarbital for her seizures. (R. 52). Regarding her anxiety, Plaintiff experiences panic attacks, which cause her to feel hot and dizzy, her heart rate to increase and her to experience difficulty breathing. (R. 51). Interacting with people and leaving her house induce the panic attacks. (R. 57). The panic attacks occur approximately five times a week. (R. 57-58). She is prescribed Celexa for her anxiety. (R. 52). When she experiences a panic attack, she takes an extra dose of Celexa, lays down and falls asleep. (R. 57).

---

[4] Plaintiff declares that she still owes approximately $50,000 in student loans. (R. 43-44).

Regarding her back pain, Plaintiff suffers from pain in her back that radiates down to her leg. (R. 59). The pain is constant and prevents Plaintiff from lifting items heavier than a milk jug or sitting/standing in the same position for longer than thirty to forty minutes. (R. 59-60). When her back pain becomes more than she can handle, she applies either heating pads or icepacks to her back. (R. 62). If the hearing pads and icepacks are ineffective, she goes to her primary care physician's office and requests "a shot." (Id.). While she is unable to afford surgery or physical therapy because she has "not had [health] insurance for [the past] two years," she is prescribed Vicodin, Flexeril and naproxen for her back pain. (R. 52, 55). In addition to her epilepsy, anxiety and back pain, Plaintiff testified that she suffers from headaches, allergies and fibromyalgia. (R. 53).

Finally, Plaintiff testified regarding her routine activities. On a typical day, Plaintiff awakens and performs her own personal care. (R. 53-54). She then makes beds and washes the laundry. (R. 54). Subsequently, she sleeps "off and on" for "most of the day." (R. 56). She is then "up off and on throughout the night because [she] take[s] those naps during the day." (R. 56-57). Once a week, she washes dishes and spends time with her sister. (R. 54). Approximately twice a week, she goes shopping. (Id.).

**D.    Vocational Evidence**

**1.  Vocational Testimony**

Larry Ostrowski, an impartial vocational expert, also testified during the administrative hearing. (R. 62-67). Initially, Mr. Ostrowski testified regarding the characteristics of Plaintiff's past relevant work. (R. 63-64). Regarding Plaintiff's most recent job as a community worker, Mr. Ostrowski characterized the position as a light

exertional, skilled position. (R. 64). Mr. Ostrowski characterized Plaintiff's previous jobs as a companion, jewelry salesperson and accounting clerk as light and semiskilled, light and skilled and sedentary and skilled, respectively. (Id.).

After Mr. Ostrowski described Plaintiff's past relevant work, the ALJ presented several hypothetical questions for Mr. Ostrowski's consideration. In the first hypothetical question, the ALJ asked:

> [A]ssume a hypothetical individual of the same age, education and work experience as [Plaintiff] who retains the capacity to perform light work, that allows to alternative sitting or standing positions for up to two minutes at 30 minute intervals without going off task, who is limited to no foot control operations bilaterally, who's limited to occasional postural, except no climbing of ladders, ropes or scaffolds, who mu[st] avoid concentrated exposure to extreme cold and heat, concentrated exposure to wetness and humidity, all exposure to unprotected heights, hazardous machinery and commercial driving, who work is limited to simple, routine and repetitive tasks barring only simple decisions with no fast paced production requirements with few workplaces changes, who is to have no interaction with the public and only occasional interaction with coworkers and supervisors.
>
> My understanding [is] that such an individual would be incapable of performing the past work of [Plaintiff], is that correct?

(R. 65). Mr. Ostrowski affirmed that such an individual could not perform Plaintiff's past work but opined that the individual could work as an office helper, mail clerk or electrical accessories assembler. (Id.). The ALJ then asked Mr. Ostrowski questions regarding how much time employers generally allow employees to be unproductive. (R. 65-66). In response to these questions, Mr. Ostrowski testified that employers generally allow an employee: (1) to be absent, late for work, or leave early from work two times per month on an unsustained basis; (2) to take a break for fifteen minutes in the morning, fifteen minutes in the afternoon and thirty minutes for lunch and (3) to be off task for up to ten percent of the workday on an unsustained basis. (Id.).

Plaintiff's counsel, Ms. Batson, also presented a question for Mr. Ostrowski's consideration during the administrative hearing. (R. 66-67). Specifically, Ms. Batson presented the following hypothetical to Mr. Ostrowski:

> If we take the same hypothetical individual from [the hypothetical that the ALJ presented], but instead of light work, this individual is only capable of performing sedentary work activity, they still would require the same sit/stand option . . . as well as the same environmental postural in hazard restrictions . . . . This individual would be unable to engage in any type of stressful situation and even a low stress environment. They need no stress in their work environment and also would not be able to engage in any interpersonal relationships. So there would be no contact with the general public and no contact with coworkers and supervisors. . . . [S]tress . . . [is defined as] any type of decision making, any type of obviously interpersonal . . . interaction[,] . . . any type of choices. So this individual would . . . need a very regimented task oriented one to three stop tasks . . . .

> Would that individual be able to perform any of [Plaintiff's] past work?

(Id.). In response to this hypothetical, Mr. Ostrowski testified that "[t]here is no job where . . . an individual could never have to interact with anybody, whether it be a supervisor, the public or coworkers." (R. 67).

## 2. Disability Reports

On August 21, 2012, Plaintiff completed a Disability Report. (R. 197-06). In this report, Plaintiff indicated that the following ailments limit her ability to work: (1) epilepsy; (2) severe anxiety; (3) high cholesterol; (4) a right foot impairment; (5) a heart murmur; (6) acid reflux; (7) enlarged lymph nodes in her neck; (8) allergies and (9) migraines. (R. 198). She further indicated that she stopped working on January 31, 2012, "[b]ecause of her conditions." (Id.). Finally, she indicated that she is prescribed aspirin, Celexa, Crestor, folic acid, phenobarbital, Prilosec and Vicodin for her impairments. (R. 200).

Ruth Byers, of Gold, Khourey & Turak, L.C., submitted two Disability Report-Appeal forms on Plaintiff's behalf. (R. 233-27, 243-47). On January 17, 2013, Ms. Byers reported that, while Plaintiff's condition had not changed, she had continued seeking treatment for both physical and mental impairments since her last Disability Report. (R. 233-34). Ms. Byers also updated Plaintiff's list of medications to Celexa, Claritin, Flexeril, folic acid, Nasonex, Percocet, phenobarbital, Prilosec and Vicodin. (R. 235). On June 6, 2013, Ms. Byers reported that Plaintiff had been diagnosed with "possible fibromyalgia" and added Mobic to her list of medications. (R. 243, 245).

**E.     Lifestyle Evidence**

**1.  Adult Function Report, September 10, 2012**

On September 10, 2012, Plaintiff submitted an Adult Function Report. (R. 207-17). In this report, Plaintiff declares that she is unable to work for several reasons. (R. 207). First, she declares that she suffers from epilepsy, which causes her to experience grand mal seizures from which she requires days to recover. (Id.). Second, she declares that she suffers from a heart murmur, which causes her to experience chest pain at times. (Id.). Third, she declares that she suffers from anxiety and panic attacks. (Id.). Finally, she declares that she suffers from a fractured skull, which causes her to experience frequent migraines and photosensitivity. (Id.).

Plaintiff discloses that she is limited in some ways but not in others. For several activities, Plaintiff requires no or minimal assistance. For example, Plaintiff is able to perform her own personal care, prepare meals for herself and her husband and care for her pet dogs, although her husband and sister help with pet care. (R. 211-12). She is able to perform household chores such as dusting and washing laundry. (R. 212). She

is able to operate a motor vehicle independently, although she usually travels as the passenger of a vehicle. (R. 213). She is able to count change, use a checkbook/money orders and shop in stores and online. (Id.). She also follows written and spoken instructions well, although she occasionally needs spoken instructions repeated a second time. (R. 215).

While Plaintiff is able to perform some activities, she describes how others prove more difficult due to her impairments. Plaintiff's impairments, particularly her epilepsy, affect her abilities to: stand, walk, talk, hear, see, recall information, complete tasks, concentrate and get along with others. (Id.). Due to her impairments, Plaintiff is only able to walk for one mile before requiring approximately thirty minutes of rest. (Id.). She is only able to pay attention for fifteen to thirty minutes. (Id.). She is not able to perform yard work, does not handle stress or changes to her routine well and experiences anxiety when she leaves her home. (R. 213, 216). She has difficulty sleeping. (R. 211). She has difficulty paying bills and handling a savings account. (R. 213-14). She explains that:

> I randomly spend money unwisely [and] impulse buy on the internet when
> I don't need the items.

(Id.). She also has difficulty getting along with others, including authority figures because she "sp[eaks her] mind on subjects before [she thinks] about it." (R. 216). She declares that she was laid off/fired from Monroe County Job & Family Services, where she worked as a social worker, due to her inability get along with others. (Id.).

Finally, Plaintiff details her routine activities. Every day, Plaintiff awakens, lets her dogs outside and takes her prescribed medications.[5] (R. 211). Shen then watches

---

[5] Plaintiff states that she is prescribed phenobarbital, Citalopram, folic acid, Vicodin,

television throughout the day. (Id.). In the evening, she prepares dinner, showers and goes to bed. (Id.). Approximately two to three times a month, she shops for groceries with her sister. (R. 214).

### 2. Adult Seizure Form, September 10, 2012

Also on September 10, 2012, Plaintiff completed an Adult Seizure Form. (R. 219-21). On this form, Plaintiff reports that she is receiving treatment for epilepsy/seizures. (R. 219). Specifically, she reports that Dr. Bradac treats her epilepsy and prescribes her phenobarbital. (Id.). She indicates that, while no physicians have witnessed one of her seizures, three other people[6] have. (R. 220). She explains that:

> I do not have any friends that know of my disability. I do not like to leave the house. All my seizures thankfully have been while I was home.

(R. 221).

Plaintiff reports that she suffers from grand mal seizures and "staring seizures." (R. 220). When describing her grand mal seizures, Plaintiff states that she "see[s] bright flashing lights" and that her head spins, after which she loses consciousness. (Id.). She further states that others have informed her that, when she loses consciousness, she falls to the ground and shakes violently for "no longer than a minute." (Id.). After her grand mal seizures end, Plaintiff states that she falls asleep for several hours. (Id.). She notes that she has not experienced a grand mal seizure since 1994. (R. 221). When describing her staring seizures, Plaintiff declares that she ceases comprehending what is happening around her. (R. 220). She further declares that these seizures "last a few

---

aspirin, Crestor and Prilosec. (R. 217). She further states that these medications cause her to experience drowsiness and dizziness. (Id.). In addition to these medications, Plaintiff reports that she is prescribed eyeglasses/contact lenses and an air brace for her right foot/ankle to wear until her "foot is healed." (R. 216).

   [6] Plaintiff identified the three people as Arlene Okey, Shelley Weese and Jennifer McKnight. (R. 220). She did not explain her relationship to these individuals. (Id.).

seconds" and occur "a few times a day." (Id.). After these seizures end, she states that develops a headache and feels drowsy. (Id.).

Plaintiff attached a note from Dr. Bradac to her Adult Seizure Form dated July 5, 2012. (R. 222). In this note, Dr. Bradac reports that Plaintiff is "unable to work at this time" due to, *inter alia*, her seizures, anxiety and right ankle/foot appointment. (Id.). Dr. Bradac further reported that Plaintiff's right ankle/foot was in a cast, which would not be removed until July 23, 2012. (Id.).

### 3. Employer Questionnaire, October 10, 2014

On October 10, 2014, Tru Jorris, a Human Resources Manager of Russell Nesbitt Services, Inc., submitted an Employer Questionnaire. (R. 182-83). Ms. Jorris reported that Plaintiff worked as a full-time employee for Russell Nesbitt Services from January 12, 2012, until March 5, 2012. (R. 182). Ms. Jorris further reported that Plaintiff's "file indicates no medical condition and [that the] agency is unaware of a medical condition [for which] accommodations were needed." (R. 183). However, Ms. Jorris noted that Plaintiff was frequently absent from work. (Id.). To illustrate, Ms. Jorris attached Plaintiff's time sheets which show that Plaintiff was absent from work, *inter alia*, for three days for bereavement after her grandmother passed away, for three to four days when a family member was hospitalized and for five days for medical reasons. (R. 186, 190-91). In addition to these absences, Plaintiff took thirty hours of time off without pay. (R. 187). After these absences, Plaintiff was instructed to "present to work in a timely manner and consistently." (R. 192-93). However, Plaintiff's employment was terminated when she "quit coming to work." (R. 183).

# IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following

criteria:

> [The] individual . . . [must have a] physical or mental impairment or
> impairments . . . of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work. . . .
> '[W]ork which exists in the national economy' means work which exists in
> significant numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses

the following five-step sequential evaluation process to determine whether a claimant is

disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable physical
> or mental impairment that meets the duration requirement [of twelve
> months] . . . or a combination of impairments that is severe and meets the
> duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your
> impairments(s). If you have an impairment(s) that meets or equals one of
> our listings . . . and meets the duration requirement, we will find that you
> are disabled.

> [Before the fourth step, [your RFC] . . . is evaluated "based on all the
> relevant medical and other evidence in your case record . . . ."]

> (iv) At the fourth step, we consider our assessment of your [RFC] and your
> past relevant work. If you can still do your past relevant work, we will find
> that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your [RFC] and
> your age, education, and work experience to see if you can make an

adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.  The claimant last met the insured status requirements of the Social Security Act on June 30, 2014.

2.  The claimant did not definitively engage in substantial gainful activity during the period from her alleged onset date of January 31, 2012[,] through her date last insured of June 30, 2014 (20 CFR 404.1571 *et seq.*).

3.  Through June 30, 2014, the date last insured, the claimant had the following severe impairments: epilepsy; osteoarthritis/arthritic changes in the left knee with reported left leg numbness; obesity; [GERD]; report of chronic low back pain with sciatica; and[ ] anxiety (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through June 30, 2014, the date last insured, the claimant had the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except: with allowance to alternate sitting or standing positions for up to two minutes, at 30 minute intervals without going off task; limited to no foot control operation bilaterally; limited to occasional postural, but can never climb ladders, ropes or scaffolds; should avoid concentrated exposure to extreme cold, extreme heat, wetness and humidity; should avoid all exposure to unprotected heights, hazardous machinery, and commercial driving; limited to simple, routine and repetitive tasks, requiring only simple decisions, with no fast-paced production requirements and few workplace changes; and, work should require no interaction with the public and only occasional interaction with co-workers and supervisors.

6.    Through June 30, 2014, the date last insured, the claimant was unable to perform any past work (20 CFR 404.1565).

7.    The claimant was born on February 12, 1978[,] and was 36 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Through the date last insured, considering the claimant's age, education, work experience, and [RFC], there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant was not under a disability, as defined in the Social Security Act, at any time from January 31, 2012, the alleged onset date, through June 30, 2014, the date last insured (20 CFR 404.1520(g)).

(R. 17-29).

# VI.    DISCUSSION

## A.    Contentions of the Parties

In her Statement of Errors, Plaintiff contends that the Commissioner's decision contains errors of law and is not supported by substantial evidence. (See Pl.'s Br. at 1). Specifically, Plaintiff contends that the ALJ: (1) failed to accord adequate weight to the opinion of her treating physician, Dr. Bradac; (2) improperly discredited Plaintiff for failing to obtain regular treatment and (3) failed to consider the evidence submitted by Plaintiff's prior employer. (Id.). Plaintiff requests that the Court reverse the Commissioner's decision or, in the alternative, remand the case for further proceedings. (Id. at 10).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that the ALJ: (1) properly accorded little weight to the opinion of Dr. Bradac; (2) properly determined that Plaintiff is not entirely credible regarding the severity of her symptoms and (3) considered the entire record, including the evidence submitted by Plaintiff's prior employer. (Def.'s Br. at 5, 8-9). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

## B.    Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was

reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Id.</u> (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th Cir. 2005).

**C.    Analysis of the Administrative Law Judge's Decision**

**1.    Whether the ALJ Improperly Assigned "Little Weight" to the Opinion of Plaintiff's Treating Physician, Dr. Bradac**

Plaintiff argues that the ALJ erred by assigning "little weight" to the opinion of her treating physician, Dr. Bradac. (Pl.'s Br. at 4). Specifically, Plaintiff argues that: (1) the ALJ failed to apply certain factors as required by 20 C.F.R. § 404.1527, such as the length of the treating relationship and the frequency of examination, and (2) Dr. Bradac's opinion that Plaintiff is unable to work is supported by substantial evidence, with no persuasive contradictory evidence. (<u>Id.</u> at 5-6). Defendant argues that the ALJ properly accorded little weight to Dr. Bradac's opinion because the opinion is

inconsistent with the record. (Def.'s Br. at 5-8).

An ALJ must "weigh and evaluate every medical opinion in the record." <u>Monroe v. Comm'r of Soc. Sec.</u>, No. 1:14CV48, 2015 WL 4477712, at *7 (N.D. W. Va. July 22, 2015). When weighing and evaluating these opinions, ALJs often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the claimant and has a treatment relationship with the claimant. <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 (4th Cir. 2005). However, this "treating physician rule . . . does not require that the [treating physician's] testimony be given controlling weight." <u>Anderson v. Comm'r, Soc. Sec.</u>, 127 F. App'x. 96, 97 (4th Cir. 2005). Therefore, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, [then] it should be accorded significantly less weight." <u>Id.</u>

When evaluating medical opinions that are not entitled to controlling weight, the ALJ must consider the following non-exclusive list: (1) whether the physician has examined the claimant; (2) the treatment relationship between the physician and the claimant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; (5) whether the physician is a specialist and (6) any other factor that tends to support or contradict the opinion. 20 C.F.R. § 404.1527 (2005). However, the ALJ need not explicitly "recount the details of th[e] analysis [of these factors] in the written opinion." <u>Fluharty v. Colvin</u>, No. CV 2:14-25655, 2015 WL 5476145, at *12 (S.D. W. Va. Sept. 17, 2015). Instead, an ALJ need only "give 'good reasons' in the decision for the weight ultimately allocated to medical source opinions." <u>Id.</u> (quoting 20 C.F.R. § 404.1527(d)(2)). In this regard, Social Security Ruling 96–2p provides that those decisions "must be sufficiently specific to make clear to any subsequent reviewers the

weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

In the present case, the ALJ noted that the record reflected two separate opinions of Dr. Bradac's. (R. 26-27). First, Dr. Bradac provided a note for Plaintiff in July of 2012 to attach to her Adult Seizure Form, in which he opined that Plaintiff is "unable to work at this time" due to, *inter alia*, her seizures, anxiety and right ankle/foot impairment. (R. 222). Second, Dr. Bradac opined in his Treating Source Statement, dated September 28, 2012, that Plaintiff possesses certain functional capacity limitations, "is unable to engage in stress[ful] situations or . . . interpersonal relations and is "totally disabled" and "unable to work." (R. 385). The ALJ then accorded these opinions "little weight," stating that they are "inconsistent with and unsupported by" the record. (R. 26). Specifically, the ALJ reasoned that:

> Lastly, in terms of treatment and examining sources, the July 2012 statement of general practitioner [Dr. Bradac]. . . that [Plaintiff] was 'unable to work at this time,' . . . the undersigned . . . accord[s] it little weight. This statement was not a function-by-function assessment, offered no quantifiable restrictions, was based in part on a transient and acute ankle sprain, was inconsistent with and unsupported by treatment records fully discussed above, appeared to be based largely on uncorroborated subjective statements from the claimant, and was not a medical opinion but rather a finding of 'disability' dispositive of a case requiring familiarity with the Regulations and legal standards therein which is an issue reserved to the Commissioner and never entitled to controlling weight.
>
> [Regarding Dr. Bradac's] September 18, 2012[,] statement stating [that Plaintiff] had moderately limited functional capacity, was capable of sedentary work, but was unable to engage in stress situations or engage in interpersonal skills and was 'unable to work' and /or 'totally disabled[,]' [t]he undersigned accord[s] this statement little weight. The statement was likewise inconsistent with and unsupported by Dr. Bradac's own treatment records fully discussed above, essentially revealing no clinical abnormalities and advising no more the continued routine and conservative management and maintenance. Statements that [Plaintiff] is 'unable to work' and/or 'totally disabled' are never entitled to controlling

weight as they are not medical opinions but statements dispositive of a case and reserved to the Commissioner. Additionally, this statement was undermined by the context in which it was produced (i.e., an attempt to assist the claimant in obtaining Student Loan deferment and/or forgiveness based upon a separate and distinct regulatory program).

(R. 26-27) (internal quotations omitted).

The undersigned finds that the ALJ properly evaluated Dr. Bradac's opinions. After determining that both of Dr. Bradac's opinions were not supported by or inconsistent with the record, the ALJ declined to accord the opinions controlling weight and proceeded to consider the five factors listed in 20 C.F.R. § 404.1527. (See id.). While the ALJ did not explicitly recount the details of his analysis of the five factors in his written opinion, he was not required to do so. Nevertheless, the ALJ's consideration of the factors is obvious by his statements that: (1) Dr. Bradac was an examining source (factor one); (2) Dr. Bradac was one of Plaintiff's treating physicians (factor two);[7] (3) Dr. Bradac's opinions were unsupported by the record (factor three); Dr. Bradac's opinions were inconsistent with the record (factor four) and (5) Dr. Bradac is a general practitioner (factor five). (Id.). The ALJ thus followed proper procedure when according the opinion little weight.

Plaintiff argues that the ALJ erred in determining that Dr. Bradac's opinions were

---

[7] Plaintiff argues that the ALJ should have more explicitly discussed factor two. (See Pl.'s Br. at 5-6). Specifically, Plaintiff argues that the ALJ should have explicitly discussed the length of the treating relationship between Dr. Bradac and Plaintiff and the frequency with which he examined her. (Id.). The ALJ was not required to do so. Fluharty, 2015 WL 5476145, at *12 (stating that an ALJ need not explicitly "recount the details of th[e] analysis [of the 20 C.F.R. § 404.1527 factors] in the written opinion"). Nevertheless, prior to his statements that Dr. Bradac's opinions deserved little weight, the ALJ documented that "[t]he record revealed relatively infrequent trips to the primary care provider, Charles Bradac, D.O." and that "Dr. Bradac rendered all treatment, aside from sporadic and rare emergent department visits[,]" in the years spanning the record. (R. 22). Therefore, despite Plaintiff's argument, the ALJ sufficiently discussed the length of the treatment relationship and the frequency with which Plaintiff was examined by Dr. Bradac.

unsupported by and inconsistent with the record, instead arguing that the opinions were supported by substantial evidence with no persuasive contrary evidence. (Pl.'s Br. at 6-7). In making this argument, Plaintiff merely appears to disagree with the ALJ's ultimate conclusion but does not challenge the accuracy of any of the ALJ's reasons for according the opinions little weight.

To illustrate, The ALJ noted that Dr. Bradac's opinions were not supported by the medical evidence he had "discussed above." (R. 26-27). Prior to discussing Dr. Bradac's medical opinions, the ALJ had summarized the medical evidence of record, which primarily consisted of Dr. Bradac's treatment notes. (R. 22-24). During this summarization of the evidence, the ALJ noted, *inter alia*, that the records were largely benign since January 31, 2012, the alleged onset date, and that Plaintiff did not complain to Dr. Bradac of uncontrolled seizure activity or of staring episodes occurring multiple times per day. (Id.). The ALJ further noted that the results of Plaintiff's CAT scans and X-rays were all predominantly insignificant. Plaintiff does not contest the accuracy of the ALJ's summarization of these records, which by and large contradicts Dr. Bradac's medical opinions.

However, it is not the role of this Court to reweigh the evidence or substitute its judgment for that of the ALJ's. Johnson, 434 F.3d at 653. Instead, the Court must evaluate whether the ALJ provided "good reasons" for the weight he assigned Dr. Bradac's opinions, which the ALJ supplied. Therefore, because the ALJ applied the proper legal standard and the accuracy of his reasons is undisputed, it is clear that the ALJ's assignment of little weight to Dr. Bradac's opinions is supported by substantial evidence.

## 2. Whether the ALJ Properly Assessed Plaintiff's Credibility

Plaintiff argues that the ALJ erred in determining that Plaintiff is "not entirely credible." (Pl.'s Br. at 7). Specifically, Plaintiff argues that the ALJ erred in holding her infrequent trips to her primary care physician against her. (Id.). Plaintiff reasons that she did not pursue regular treatment because she did not have medical insurance and could not afford regular treatment and that a claimant cannot be penalized for his or her insufficient funds. (Id. at 8-9). Defendant argues that the ALJ's credibility determination is supported by substantial evidence. (Def.'s Br. at 8).

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1) (2011); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. Id.

Social Security Ruling 96-7p[8] sets out several factors for an ALJ to use when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

---

[8] On March 16, 2016, SSR 96-7p was superseded by SSR 16-3p. Nevertheless, because SSR 16-3p was not issued until after the date of the ALJ's decision, the undersigned will review whether the ALJ's decision comports with SSR 96-7p, the ruling that was applicable at the date of the ALJ's decision.

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). An ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "not entirely credible." (R. 22). Initially, the ALJ determined that Plaintiff had proved that she suffers from medical impairments that cause "some symptomatology and diminished functional abilities." (Id.). However, the ALJ noted that "[t]he record was absent of objective medical findings that convincingly supported [her] impairment-related complaints, including largely benign diagnostic testing." (R. 27). Then, after examining the factors outlined in SSR 96-7p, the ALJ further determined that Plaintiff's "description[s] of [her] impairments, symptoms and limitations are not entirely credible" in light of the entire record. (R. 22).

### i. Plaintiff's Daily Activities

The ALJ considered Plaintiff's daily activities (factor one) when assessing her credibility. Specifically, the ALJ documented that, on a typical day, Plaintiff performs her own personal care, cares for animals, performs household chores and prepares meals. (Id.). The ALJ also documented that Plaintiff is able to use a telephone, manage her finances, socialize with others, shop in stores and online and operate a motor vehicle, noting that she had driven herself to her administrative hearing, "a trip taking approximately 60 minutes." (Id.). After detailing Plaintiff's daily activities, the ALJ stated:

> [Plaintiff] remain[s] engaged in numerous activities. Even granting that she may perform some of these activities slowly, with difficulty, with rest breaks, occasionally, and/or with the assistance of other people at times, her activities [are] inconsistent with the severity of impairment alleged . . . .

(R. 25).

### ii. Plaintiff's Pain and Other Symptoms

The ALJ also reviewed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two) and the factors that precipitate and aggravate

those symptoms (factor three). Regarding Plaintiff's symptoms, the ALJ noted that Plaintiff primarily complains of anxiety and seizures, which entail "flashing lights, head spinning, and staring episodes . . . after which she [feels] drowsy, [and] want[s] to sleep." (R. 21-22). Additionally, the ALJ noted that Plaintiff experiences, *inter alia*, headaches, photosensitivity, back pain, left leg numbness and "fatigue secondary to medication." (R. 21-25) (extensively detailing the record and Plaintiff's various symptomatology allegations).

Regarding factors that precipitate/aggravate Plaintiff's symptoms, the ALJ documented that Plaintiff had testified at her administrative hearing that bright lighting may precipitate a seizure. (R. 22). However, the ALJ further documented that, despite Plaintiff's claims that the lighting in the hearing room "was bothersome," she remained fully engaged in the hearing process and displayed no adverse effects. (Id.).

### iii.    Plaintiff's Medications

Next, the ALJ generally discussed the medication that Plaintiff is prescribed for her symptoms (factor four). For example, the ALJ noted that Plaintiff is prescribed phenobarbital for her seizures, pain medication, anti-anxiety medication, anti-inflammatories and muscle relaxers and takes over-the-counter medication for her GERD. (R. 22-24). The ALJ then noted that Plaintiff did not receive the type of medical treatment one would expect for a totally disabled individual in part because her "[m]edication dosages were largely unchanged" throughout the record. (R. 22).

### iv.    Other Treatment and Measures Used to Relieve Symptoms

The ALJ also reviewed treatment other than medication that Plaintiff has received for relief of her symptoms (factor five), as well as measures Plaintiff uses to relieve her

symptoms on her own (factor six). Regarding treatment other than medication that Plaintiff has received for her symptoms, the ALJ noted that Plaintiff has "not receive[d] the type of medical treatment one would expect for a totally disabled individual." (R. 22). The ALJ explained that the "record reveal[s] relatively infrequent trips to [her] primary care provider[,] . . . a general practitioner[,]" and that "[a]ny treatment received . . . was essentially routine and/or conservative in nature." (Id.). The ALJ also noted that Plaintiff never sought specialized treatment. (R. 23).

Regarding measures Plaintiff uses to relieve her symptoms on her own, the ALJ explicitly documented that he considered the "other measures [Plaintiff takes] to relieve her symptoms." (R. 27). However, the ALJ further documented that Plaintiff does not perform certain measures that one would expect of her, stating that "although alleging anxiety, [she] report[s] considerable daily caffeine intake of two to three cans of soda per day." (See R. 25).

Plaintiff argues that the ALJ erred in holding her infrequent trips to her primary care provider and her failure to seek more extensive treatment against her. (Pl.'s Br. at 7-9). Plaintiff explains that she testified during her administrative hearing that she did not pursue additional treatment because she did not have medical insurance and could not afford the cost of additional care. (Id.). It is well-settled that a plaintiff "may not be penalized for failing to seek treatment she cannot afford." See Lovejoy v. Heckler, 790 F.2d 1114 (4th Cir. 1986); see also Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984) (stating that a claimant's failure to seek treatment due to a lack of funds may not be used as a factor in a credibility determination). Initially, the undersigned notes that there is no treatment note or medical record that corroborates Plaintiff's testimony. For

example, nothing in the record reflects that one of Plaintiff's treating physicians recommended additional care or that her treatment options were limited due to cost. Nevertheless, assuming *arguendo* that the ALJ should not have held Plaintiff's failure to seek more extensive treatment against her, the undersigned finds that such error was harmless in nature because it does not render the ALJ's otherwise thorough and well-reasoned credibility determination improper. See Emigh v. Comm'r of Soc. Sec., No. 3:14-CV-36, 2015 WL 545833, at *21 (N.D. W. Va. Feb. 10, 2015) ("The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination.").

### v. Other Factors

One additional factor that the ALJ considered when assessing Plaintiff's credibility was her report of "substantial outstanding debt."[9] (R. 27). Specifically, the ALJ noted:

> The record was suggestive of potential secondary sources of motivation underlying [Plaintiff's] efforts to obtain contingent financial-related disability benefits, such as reports of substantial outstanding debt. Such [a factor] along with what has previously been articulated tend[s] to undermine the veracity and call into question the reliability of [Plaintiff's] self-reported allegations and information.

---

[9] During oral arguments, Plaintiff argued that the ALJ's consideration of this factor was improper. However, Plaintiff pointed to no authority to support her contention and other precedent exists stating the contrary. See, e.g., Walter v. Astrue, No. 5:12CV65, 2013 WL 2422779, at *18 (N.D. W. Va. June 3, 2013) (stating that it is not improper for an ALJ to consider a plaintiff's secondary gain as a motivating factor in a credibility assessment); Kandel v. Astrue, No. CIV.A. 1:09-CV-31, 2009 WL 6326810, at *11 (N.D. W. Va. Nov. 4, 2009) (stating that, when assessing a claimant's credibility, an ALJ is allowed to consider inconsistencies that exist in the record that could discredit the claimant's testimony and that such inconsistencies include evidence of potential motivating secondary gain).

(Id.).

### vi. Substantial Evidence Supports the ALJ's Credibility Determination

After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make clear his reasoning in finding Plaintiff not entirely credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden. Consequently, the undersigned accords the ALJ's credibility determination the great weight that it is entitled.

### 3. Whether the ALJ Considered all of the Relevant Evidence

Plaintiff argues that the ALJ failed to consider an "employer questionnaire from her previous employer, Russell Nesbitt Services, Inc. (R. # 182-193)" when assessing her credibility and when determining her ability to work and that, therefore, the matter should be remanded. (Pl.'s Br. at 9). Plaintiff reasons that the questionnaire is significant because it details Plaintiff's excessive absences due to medical issues, substantiating her allegations that she is unable to perform sustained substantial gainful activity. (Id.). Defendant argues that the ALJ considered the questionnaire and that, even if he had not, the questionnaire is insignificant. (Def.'s Br. at 9).

An ALJ is required to *consider* all of the relevant medical evidence submitted by a claimant. 20 C.F.R. § 416.920. However, an ALJ is "not obligated to *comment on* every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015); Reid, 769 F.3d at 865 (stating that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Instead, an ALJ's decision need only "contain a statement of

the case, in understandable language, setting forth a discussion of the evidence, and stating [his or her] determination and the reason or reasons upon which it is based." Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). In other words, an ALJ need only "provide a minimal level of analysis that enables [a] reviewing court[ ] to track the ALJ's reasoning." McIntire v. Colvin, No. 3:13-CV-143, 2015 WL 401007, at *5 (N.D. W. Va. Jan. 28, 2015). Therefore, if an ALJ states that the "whole record was considered, . . . absent evidence to the contrary, we take [him] at [his] word." Reid, 769 F.3d at 865.

In the present case, the undersigned finds that the ALJ considered all of the relevant evidence, including the employer questionnaire at issue. In his decision, the ALJ stated that he had carefully considered the entire record when proceeding through the five-step evaluation process. (R. 17). The ALJ further stated in his decision that he had considered the entire record when assessing Plaintiff's credibility and when determining her RFC. (R. 21). Because no evidence exists to refute the ALJ's statements, the undersigned accepts these statements as true. Moreover, the undersigned notes that the ALJ clearly examined the questionnaire because he specifically cited to it when determining that Plaintiff had not engaged in substantial gainful activity since her alleged date of onset. (R. 17) (citing to the questionnaire after stating that an "[e]mployer report showed [Plaintiff] was hired on January 12, 2012 . . . ."); Pearson v. Colvin, No. 2:14-CV-26, 2015 WL 3757122, at *34 (N.D. W. Va. June 16, 2015) (stating that a reviewing court must read the "decision as a whole" when evaluating what evidence the ALJ considered).

The undersigned further finds that the ALJ did not err by not commenting on the

employer questionnaire during his credibility and RFC assessments. While the ALJ did not comment on every piece of evidence presented during his credibility and RFC assessments, he was not required to do so.[10] Instead, the ALJ was only required to provide a minimal level of analysis to allow a reviewing court to follow his reasoning, which the ALJ supplied and which Plaintiff does not challenge. Consequently, the undersigned finds that Plaintiff's contention that the ALJ failed to consider the employer questionnaire provided by Russell Nesbitt Services, Inc., is without merit.

## VII.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for DIB is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Statement of Errors (ECF No. 8) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and

---

[10] During oral arguments, Plaintiff contended that the ALJ should have discussed the questionnaire because he was required to consider Plaintiff's work history as a factor in Plaintiff's credibility assessment. However, a claimant's work history is not an enumerated factor that must be considered by an ALJ in a credibility assessment. SSR 96-7p, 1996 WL 374186, at 3. Moreover, an ALJ need not document his or her analysis of each factor of a credibility assessment. See Wolfe, 2015 WL 401013, at *4.

Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 14th day of October, 2016.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE